[Civ. No. 1638.   Fourth Appellate District.—January 19, 1937.]

EARL McCLINTOCK, Respondent, v. LOUIS ROBINSON, Appellant.

Forgy, Reinhaus & Forgy for Appellant.

L. E. Dadmun for Respondent.

MARKS, J.—Plaintiff brought this action to recover damages for malicious prosecution. He was given judgment for $2,750 and costs, and defendant has appealed.

The action grew out of the prosecution of plaintiff for grand theft. On September 5, 1934, defendant verified a complaint in the Justice's Court of Santa Ana Township charging McClintock with stealing a cabin of the value of $350. A warrant of arrest was issued and plaintiff was arrested in Los Angeles. He was taken to the county jail, where he remained for about eight hours before being released on bail. He was photographed and fingerprinted while in jail. At his preliminary examination he was held to answer. An information was filed against him and the case proceeded to trial. After two witnesses had been examined by the People the case was dismissed on motion of the district attorney. This action followed.

The trial court found that defendant instituted the criminal proceeding maliciously and falsely and without probable cause because he had sold the cabin to plaintiff, accepted payment for it, and knew that plaintiff claimed to be and was the owner of it. This particular finding and the conclusions of law based upon it are as follows:

"The Court further finds from the evidence introduced in said action, that the plaintiff Earl McClintock purchased the cabin referred to in said criminal complaint, from the defendant Louis Robinson, through one I. P. Arnold, and that plaintiff at all times thereafter claimed to own said cabin, . . .

"CONCLUSIONS OF LAW

"No. 1. As a conclusion of law from the above and foregoing facts, the Court finds that said Louis Robinson, defendant above named, did, without probable cause, and with malice, cause the said plaintiff Earl McClintock to be arrested and charged with the crime of a felony, to-wit: grand theft, knowing at the time that there did not exist any reasonable or probable cause to believe, and that said defendant Louis Robinson did not believe the said Earl McClintock guilty of said crime, and did not act in good faith, and with the honest belief that a crime, to-wit: grand theft, had been committed, and that said plaintiff Earl McClintock committed said crime.

"No. 2. As a conclusion of law from the above and fore-going Findings of Fact, the Court finds that the said plaintiff Earl McClintock, bought from the defendant Louis Robinson, through I. P. Arnold, the cabin in controversy, and paid therefor the sum of twenty-five ($25.00) dollars."

Defendant urges, and we think correctly, that this finding and the quoted conclusions form the foundation for and support of the judgment and that if they do not find support in the evidence the judgment must be reversed. This requires an examination of the evidence to enable us to determine if it contains any evidence showing a sale of the cabin to plaintiff.

In his direct examination plaintiff testified that in 1929 the cabin was located on the extreme west end of the property of defendant; that he bought the cabin from defendant and paid him $25 for it; that the transaction was completed with defendant personally and the money paid him in plaintiff's office in Los Angeles; that the cabin was repaired at a cost of about $216, which was paid, one-half by plaintiff, and one-half by I. P. Arnold, who was mining clay on defendant's property; that in 1931 plaintiff moved the cabin off from defendant's property to property owned by plaintiff.

On cross-examination and on redirect examination plaintiff told an entirely different story and corrected his former evidence. He testified that he did not see defendant nor did he talk to him about the purchase of the cabin; that he gave Arnold $25 with which to purchase the cabin for him; that Arnold told him he had done so, but that plaintiff had no personal knowledge of the transaction consummated between Arnold and defendant.

Defendant testified that he had neither seen nor talked to plaintiff about the sale of the cabin; that Arnold approached him about the sale of the cabin to Arnold, but not to plaintiff; that defendant told Arnold he would sell him the cabin for $250; that it was finally agreed between defendant and Arnold that the cabin be leased to Arnold for $25 in cash and the repair of the cabin by Arnold at his own cost and expense; that for this consideration Arnold would have the use of the cabin as long as Arnold's lease on clay mines on defendant's property were in full force and effect; that the cabin was repaired and was occupied by Arnold; that later Arnold told him the cabin was too far from the clay

mines and asked permission to move it nearer the mines; that defendant consented to the moving of the cabin if it be moved to another location on his property; that he saw the cabin being moved off his property but did not object as he had received his rent for it and assumed it would be moved back; that it was not until the summer of 1934 that he learned that plaintiff claimed title to the cabin and that it would not be moved back onto his property.

Arnold testified as a witness on behalf of defendant and corroborated defendant's evidence in all particulars. He contradicted plaintiff's testimony to the effect that plaintiff had requested Arnold to buy the cabin for him; that plaintiff had given him the $25 with which to buy the cabin, and, that he had told plaintiff that he had purchased the cabin for plaintiff. Arnold further testified that the $25 was paid by him out of his own money. He testified that plaintiff wanted to use the cabin for occasional week ends and offered to pay half the cost of its repair for this privilege; that the cabin was repaired at a cost of about $216; that he was selling clay to the American Refractories Company which employed McClintock and that $108, or half the cost of these repairs, was deducted from money due him for clay sold that company.

During the redirect examination of plaintiff his counsel sought to prove the true facts of the purchase of the cabin and that plaintiff did not personally see or talk to defendant about the purchase of the cabin in his office or elsewhere nor did he personally pay plaintiff $25. In a statement to the trial court counsel for plaintiff said:

"The inference might be drawn that Robinson was in his office in Los Angeles but that is the wrong inference to be drawn. In other words, if he wasn't there I don't want it to stand of record as a fact if it is not a fact and if he made an error and wants to change his testimony he has a right to do that. . . . Now, it would seem to me that we have the right to show how they had purchased that property, how the purchase came about and through whom. Arnold, assuming for the sake of argument, that he was merely the agent and not associate of his, it would be more than an agency, we can show that the money was paid to the agent and afterward the agent went and delivered the money to the owner."

Thereafter plaintiff testified that the transaction was conducted through Arnold and that he had no personal knowledge of the negotiations nor of the final agreement.

Thus it appears that the only evidence in the record to the effect that plaintiff actually bought the cabin from defendant, and paid him for it, was that given by plaintiff in his direct examination. That plaintiff was mistaken in thus testifying is too clear for argument. He clearly repudiated and corrected this testimony many times during his subsequent examination by both counsel. His counsel also repudiated it in his statement to the trial court and sought to proceed with the case upon the theory that plaintiff purchased the cabin through Arnold acting as his agent. It is clear that plaintiff had no personal knowledge of the negotiations between Arnold and defendant nor of the terms of the contract between them. This is supported by the testimony of plaintiff, Arnold, and defendant.

A somewhat similar situation arose in the case of *King* v. *Superior Court,* 12 Cal. App. (2d) 501 [56 Pac. (2d) 268], where an attorney fixed, in his direct examination, one date as the time of a certain conversation and later was recalled at his own request and corrected his former testimony by fixing a later date as the time of the conversation. This court was of the opinion that the fact that the witness first fixed an erroneous date as the time of the conversation which was obviously a mistake and which he subsequently corrected did not create a "substantial conflict in the evidence" and remarked that "a record should be construed fairly in order that the truth may be ascertained and we feel that in fairness to all parties concerned no other interpretation could be placed upon the record."

The remarks just quoted strongly apply to the situation before us. The evidence of plaintiff on his direct examination that he personally purchased the cabin from defendant and personally paid him for it is so clearly incorrect that it cannot create a "substantial conflict in the evidence" it being repudiated by plaintiff and his counsel and contradicted by all the other witnesses having knowledge of the facts. ■ We are, therefore, confined to the evidence of Arnold and the defendant to determine the exact nature of the transaction concerning the cabin. In so doing we will

assume, without holding, that the theory of plaintiff is correct and that Arnold was actually acting throughout the negotiations as the agent of plaintiff who was an undisclosed principal. In so doing we are not unmindful of the testimony of Arnold denying the existence of any such agency.

Of course, a principal, disclosed or undisclosed, may contract with another through an agent. The contract of the agent made within the scope of his authority binds his principal and the other contracting party. But here we have no such situation presented. The principal intended one contract, the purchase of the cabin. The agent made another, the lease of the cabin. Just because the principal had the undisclosed intention of buying the cabin, and the agent violated his authority and leased it from the owner who had no idea that a sale was contemplated, can the principal maintain title passed to him against the intention and without the knowledge or consent of the owner? Clearly not. The principal must either disaffirm the unauthorized act of his agent or ratify the unauthorized contract in the form his agent made it. He cannot reform the contract to conform to his own secret purposes.

"A contract is an agreement to do or not to do a certain thing." (Sec. 1549, Civ. Code.) One of the essential elements of a contract is the consent of the parties. (Sec. 1550, Civ. Code.) This consent must be mutual. (Sec. 1565, Civ. Code.) "Consent is not mutual, unless the parties all agree upon the same thing in the same sense. . . . " (Sec. 1580, Civ. Code.) (See, also, Restatement of the Law, Contracts, sec. 19.) As is said in 6 California Jurisprudence, page 41:

"Mutual consent is necessary to the existence of any contract. Assent of at least two minds to each and all of the essentials of the agreement is required; and it is only upon evidence of such assent that the law enforces the terms of a contract or gives a remedy for a breach of it. One cannot be made to stand on a contract to which he never consented."

When we apply these rules to the facts before us it is immediately apparent that one of the necessary elements of a valid contract is lacking. There was no mutual assent,— no meeting of the minds. It follows that there was no contract of sale of the cabin between plaintiff and defendant. In the absence of such contract plaintiff did not buy the cabin

and title to it did not pass to plaintiff but remained in defendant. It follows that the challenged finding and the conclusions of law based upon it are not supported by the evidence and are contrary to it. Without the support of this finding, and those conclusions, the judgment must fall.

Judgment reversed.

Barnard, P. J., and Jennings, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 16, 1937.