Filed 9/10/25  P. v. Gonzalez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Lassen)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>JOSEPH STEVEN GONZALEZ,<br><br>        Defendant and Appellant. | C100423<br><br>(Super. Ct. No. 2021-CR0023323) |

Jorge Andrade repeatedly stabbed a fellow inmate, Jonathan Diaz, in Yard No. 2 inside High Desert State Prison using a smuggled prison-made metal weapon.  Defendant Joseph Steven Gonzalez was seen on security footage entering the yard in a wheelchair, from which Andrade retrieved a stiff gray cloth suggesting a concealed item inside.  This exchange happened immediately before the stabbing.

A jury convicted defendant of first degree attempted murder, the prosecution arguing that defendant aided and abetted Andrade in Andrade's attempt to murder Diaz.  On appeal, defendant contends insufficient evidence supports the jury's findings that, as

1

an aider and abettor, (1) he had an intent to kill; (2) he knew Andrade had an intent to kill; and (3) Andrade had an intent to kill.

We affirm the judgment.

FACTS AND HISTORY OF THE PROCEEDINGS

Correctional Officer Juan Mejia was assigned to Facility C, Yard No. 2 at High Desert State Prison on August 30, 2020. At around 10:44 a.m., Mejia responded to a radio call regarding a fight in the yard. Watching through a security door window, he saw Andrade attacking and striking Diaz using stabbing motions. Diaz's shirt was quickly becoming saturated in blood. Mejia and other correctional officers restrained both inmates and found an inmate-manufactured stabbing weapon on the ground near Andrade. The weapon was a flat metal weapon measuring nine inches long and one inch wide fashioned to a point at one end with a plastic handle at the other.

Diaz was taken to the prison's trauma treatment area with 10 or 11 stab wounds to his neck, face, back, arms, and chest. He was later airlifted to an outside hospital

Investigative Services Unit Officer Benjamin Parrish reviewed video surveillance footage of the attack to determine how the weapon entered the prison yard. The video showed defendant, reportedly afflicted with Parkinson's disease, being wheeled into the exercise yard sitting in a wheelchair. Andrade is nearby. Defendant moved his left arm to the back lower part of his torso. About 30 seconds later, he stood up and walked away from the wheelchair. About a minute later, at 10:39 a.m., Andrade walked up to the empty wheelchair and picked up a gray cloth from the seat of the chair.

The gray cloth appeared to be "stiff," suggesting it covered a solid straight object. Andrade then walked away with the cloth. The video shows Andrade adjusting his left sleeve while manipulating the cloth. During this time, Andrade appears to be placing a solid object within his sleeve. Thereafter, the cloth was limp.

Another video recorded approximately five minutes later, beginning at 10:44 a.m., showed Andrade holding a large weapon in his left hand and stabbing Diaz repeatedly. Moments later, the weapon fell out of Andrade's hand to the ground.

Officer Parish did not preserve surveillance footage showing defendant initially entering the yard and the associated search of him or his wheelchair prior to his entry into the yard. He did not analyze the weapon for fingerprints or DNA evidence or search defendant's or Andrade's prison cells for evidence. No one collected the cloth during the investigation.

Before entering the prison yard, all inmates are subject to an unclothed body search, and they must pass through metal detectors and handheld metal detectors. Inmates in wheelchairs do not pass through the metal detectors because the metal chair would set off an alarm. While officers are supposed to remove the inmate from his wheelchair and search the wheelchair and the inmate "to the best of your abilities," the officers do not always do so.

At trial, defendant did not testify and called Andrade as his only witness.

Andrade testified that at the time of his assault on the victim, he was incarcerated at High Desert State Prison serving a sentence of life without the possibility of parole for first degree murder. He said that on August 30, 2020, he stabbed Diaz because Diaz owed him money and had told him to "come and get it." Andrade pleaded guilty to assault with a deadly weapon for stabbing Diaz and was sentenced to an additional prison term of 11 years.

Andrade testified that he stabbed Diaz using a "quick shank" he had made the day before. That night, he said, he gave the weapon to a kitchen worker he knew to help him get the weapon into the exercise yard. Andrade would not identify the kitchen worker who helped him because he did not "want to incriminate anyone else." Andrade denied that defendant brought the weapon to the yard.

3

Andrade stated he received a gray bandana from defendant's wheelchair which he had asked for so he could wipe blood off himself when he used his weapon. By that time, the weapon was concealed in his sleeve, even though it appeared from the video he was holding his shirt sleeve open while he retrieved items from the wheelchair. Andrade believed he could conceal that he was the attacker by cleaning himself with the bandana.

In closing arguments following the conclusion of the evidence, the prosecution argued defendant was guilty of attempted murder because he aided and abetted Andrade by using his wheelchair to smuggle a manufactured weapon onto the prison yard.

The jury found defendant guilty of premediated attempted murder, assault with a deadly weapon in state prison, and possession of a weapon in prison. (Pen. Code, §§ 187, subd. (a)/664, subd. (a); 4501, subd. (a); 4502, subd. (a).) (Statutory section citations that follow are to the Penal Code unless otherwise indicated.) Defendant thereafter admitted a prior strike conviction. The trial court sentenced defendant to a prison term of 14 years to life for the attempted murder, with parole eligibility doubled from seven years to 14 years for the prior strike. For the assault and weapon possession counts, the court sentenced defendant to eight years and six years respectively, but it stayed execution of those sentences under section 654.

## DISCUSSION

To be guilty of attempted murder as a direct aider and abettor, a person (1) must give aid or encouragement (2) with knowledge of the direct perpetrator's intent to kill, and (3) "with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*People v. Lee* (2003) 31 Cal.4th 613, 624.)

Defendant contends the evidence is not sufficient to support the jury's findings that Andrade intended to kill Diaz, defendant knew Andrade intended to kill Diaz, or that defendant, too, harbored an intent to kill.

4

# I

## *Standard of Review*

In reviewing a claim of insufficient evidence supporting a conviction, we " ' " 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)  In doing so, the court presumes the existence of every fact that can be reasonably deduced from the evidence.  (*People v. Flores* (2020) 9 Cal.5th 371, 411.)  This includes reasonable inferences arising from circumstantial evidence.  (*Ibid*.)  The court does not need to be convinced beyond a reasonable doubt by the evidence available in the record, but it must decide whether " ' " 'any rational trier of fact' " could have been so persuaded.' " (*People v. Wharton* (1991) 53 Cal.3d 522, 546.)  "[E]vidence that merely raises suspicion, no matter how strong, of the guilt of a person charged with a crime is not sufficient to sustain a verdict and judgment against him." (*People v. Draper* (1945) 69 Cal.App.2d 781, 786.)

This standard applies to cases where the prosecution relies primarily on circumstantial evidence.  (*People v. Bean* (1988) 46 Cal.3d 919, 932.)  Circumstantial evidence may be sufficient to prove a defendant's guilt of a crime beyond a reasonable doubt.  (*Id*. at pp. 932-933.)

We do not reevaluate evidence or witnesses for persuasiveness.  " '[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.' " (*People v. Kidane* (2021) 60 Cal.App.5th 817, 824.)  "[A]n appellate court may not substitute its judgment for that of the jury" if circumstances reasonably justify the jury's findings, even when a contrary finding might also be supported.  (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)

"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

II

*Evidence of Andrade's Intent to Kill*

Defendant contends the evidence does not support a finding that Andrade intended to kill Diaz. Defendant argues Andrade's lack of intent can be deduced from Diaz sustaining only non-fatal injuries from the attack. For support, defendant claims that Andrade's grip on the weapon, holding much of it in his hand, would inflict a less penetrating stab wound. Defendant argues that we must conclude the People did not meet their burden to prove Andrade possessed the requisite intent to kill.

The evidence in the record demonstrates defendant's argument is without merit.

Attempted murder requires both evidence of specific intent to kill and a direct but ineffectual act to accomplish the intended killing. (*People v. Canizales* (2019) 7 Cal.5th 591, 602.) Direct evidence of specific intent is rare and "the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*Ibid*.) "The extent and location of a knife wound are pertinent to a determination of the intent with which it was inflicted." (*People v.* Silva (1953) 41 Cal.2d 778, 782.)

The placement and severity of the wounds on Diaz demonstrate an ineffectual but intentional effort to kill Diaz. Andrade stabbed Diaz in the neck, face, chest, and back 10 or 11 times with a metal weapon while chasing Diaz in the prison yard. When questioned at trial, Andrade confirmed he was hoping for a "lucky hit" that would bring Diaz down. When asked directly if he intended to kill, he replied, "somewhat." When Adrade was asked if he "just tried to kill an inmate over money," Andrade testified, "Right."

6

The surveillance footage supports Andrade's intent to kill. When Andrade first gripped the weapon, he gripped it normally using its full length. His grip changed only after he started to attack Diaz. Andrade's failure to kill Diaz came after Diaz started to turn away from Andrade and his weapon and run to avoid the attack. The video shows Andrade pursuing Diaz while stabbing at him at full force repeatedly around the head, neck and chest. We note that "poor marksmanship" does not establish a lack of intent to kill. (*People v. Lashley* (1991) 1 Cal.App.4th 938, 945.)

Finally, the killing capacity of the weapon Andrade used is telling evidence of Andrade's intent to kill Diaz.

The evidence is sufficient for the jury to have found Andrade intended to kill Diaz.

III

*The Evidence Was Sufficient for the Jury to Conclude that Defendant Knew Andrade Intended to Kill Diaz*

Defendant asserts there is not sufficient evidence to support the jury's finding that defendant knew that Andrade intended to kill Diaz.

Defendant argues that because there was no evidence of verbal or written communications between defendant and Andrade, no evidence the two men were friends or that Andrade told defendant he intended to kill Diaz before the attack occurred and because a correctional officer testified that weapons in prison can be used for other purposes, such as self-defense, the evidence was not sufficient to support the jury's verdict.

To prove a charge of aiding and abetting an attempted murder, the prosecution must show that defendant knew Andrade intended to kill Diaz in addition to providing him aid to that end. Knowledge of "the perpetrator's specific intent [is] when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or

7

encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 560.)

Even without direct evidence of defendant's knowledge of Andrade's intent, there was more than sufficient circumstantial evidence from which the jury could conclude that defendant knew what Andrade intended. Circumstantial evidence of defendant's knowledge of Andrade's intent can be found in the precise sequence and timing of events leading up to the stabbing, including the apparent transfer of the weapon.

Defendant was wheeled close to Andrade in the yard. Shortly after he arrived at that place, defendant began working with something with his hand behind his lower back as if he is reaching for or manipulating an object. Before defendant got up and walked away, Andrade looked directly at him as if in anticipation. Andrade walked up to the wheelchair in the seconds after defendant walked away and picked up the gray cloth. The cloth itself was stiff as if it was concealing a solid object, and later appeared to be limp after Andrade was seen adjusting it in his sleeve.

The jury could reasonably conclude that a coordinated exchange such as was shown in the video was not accidental and one that would not have been possible without a prior agreement between defendant and Andrade. Viewed in a light most favorable to the judgment, the evidence established that defendant and Andrade planned to exchange the inmate-manufactured weapon.

The nature of the weapon defendant took into the prison yard to provide to Andrade was compelling evidence that Andrade intended to use it as a lethal weapon and, thus, compelling evidence of Andrade's intent. The jury could reasonably conclude defendant knew he was delivering to Andrade a nine-inch-long metal shank sharpened to a point that was capable of and designed for killing, which Andrade intended to use to kill Diaz. Defendant, with full knowledge of the nature of the weapon, by his actions aided in surreptitiously making the weapon available to Andrade and allowed the jury also to reasonably conclude that defendant shared Andrade's intent to kill Diaz.

8

As to Andrade's testimony that defendant was not involved in Andrade's attempted murder of Diaz, the jury was called upon to evaluate Andrade's credibility in making that denial. "[A] trier of fact 'is entitled to accept or reject all or any part of the testimony of any witness or to believe and accept a portion of the testimony of a particular witness and disbelieve the remainder of his testimony.' " (*Friddle v. Epstein* (1993) 16 Cal.App.4th 1649, 1659.)

The jury found Andrade's testimony not credible, a finding that is supported by Andrade's understandable motive to protect his collaborator from the charges brought against him. Andrade severely undermined his credibility with a vague claim lacking detail that the kitchen staff assisted him in securing the weapon and delivering it to the exercise yard and Andrade's refusal to name the kitchen staff member who assisted him.

Moreover, at the time of the attack, Andrade had already been sentenced to life without the possibility of parole. He had nothing to lose in mounting the attack or in lying for defendant. The jury reasonably could disbelieve Andrade's testimony regarding defendant's participation in the crime.

The evidence was sufficient for the jury to conclude beyond a reasonable doubt that defendant knew Andrade harbored an intent to kill.

IV

*Evidence that Defendant Intended to Kill*

Defendant argues the evidence was not sufficient to show that he had an intent to kill. He asserts that, since there was no testimony that defendant knew Diaz or had a desire to kill him, since there was no evidence that he and Diaz were members of rival gangs, and since there was no evidence Diaz owed defendant money, the jury's finding that defendant had an intent to kill Diaz is based only on suspicion.

While closely related to the proof of defendant's knowledge of Andrade's intent to kill, the personal intent to kill is nonetheless distinct. For aiding and abetting attempted

9

murder, a defendant must have both knowledge of the intended killing and give aid that in fact supported the commission of that crime. Both knowledge and intentional aid are needed for guilt of a crime through aiding and abetting. " ' "[M]ere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting." ' " (*People v. Burgos* (2022) 77 Cal.App.5th 550, 559, review granted July 12, 2022, S274743, revd. on other grounds (2024) 16 Cal.5th 1.) A person guilty of aiding and abetting a crime must give such aid with knowledge of the perpetrator's criminal purpose and with the intent of facilitating the perpetrators' commission of the crime in question. (*People v. Lee, supra*, 31 Cal.4th at p. 624.)

For a charge of attempted murder, it is well settled that specific intent to kill may be shown by circumstantial evidence. (*People v. Sanchez* (2016) 63 Cal.4th 411, 457.) "One who intentionally attempts to kill another does not often declare his state of mind either before, at, or after the moment he shoots. Absent such direct evidence, the intent obviously must be derived from all the circumstances of the attempt, including the putative killer's actions and words. Whether a defendant possessed the requisite intent to kill is, of course, a question for the trier of fact. While reasonable minds may differ on the resolution of that issue, our sole function is to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Lashley, supra*, 1 Cal.App.4th at pp. 945-946.)

The same evidence that supports defendant's knowledge of Andrade's intent to kill also supports a finding he himself intended to kill. There is sufficient evidence for the jury to have found defendant was valuable, if not essential, to Andrade in committing these crimes and was recruited by Andrade specifically because defendant used a wheelchair. Wheelchairs were not always searched for weapons as wheelchairs entered the yard and it was thus more likely a prisoner in a wheelchair could smuggle a deadly metal weapon into the prison yard.

The video evidence is compelling in showing the orchestrated way defendant manipulated the nine-inch-long shank behind his back to make it available to Andrade after defendant walked away from the wheelchair. The jury reasonably could conclude that defendant had been told what he needed to do to assist Andrade in gaining access to the weapon in the yard and was either told or otherwise must have known of Andrade's intentions. As earlier noted, the nature of the weapon that defendant knowingly handled alone is significant evidence of Andrade's and defendant's intent to kill Diaz.

Defendant's contention that no evidence showed his intent to kill is based solely upon the fact that no *direct* evidence was provided. As previously noted, "[d]irect evidence of the mental state of the accused is rarely available . . . ." (*People v. Beeman, supra,* 35 Cal.3d at p. 558.) The trier of fact is and must be free to infer a defendant's mental state "when such an inference is supported by circumstantial evidence regarding the actions of the accused. Thus, an act which has the effect of giving aid and encouragement, and which is done with knowledge of the criminal purpose of the person aided, may indicate that the actor intended to assist in fulfillment of the known criminal purpose." (*Id*. at pp. 558-559.)

As with its finding of defendant's knowledge of Andrade's intent, the jury's conclusion that defendant also harbored an intent to kill was not based only on suspicion and speculation. The jury based its finding on reasonable inferences drawn from the circumstantial evidence presented, not on conjecture, and thus there was substantial evidence for a rational trier of fact to decide beyond a reasonable doubt that defendant also intended to kill Diaz.

## DISPOSITION

The judgment is affirmed.

_____
HULL, J.

We concur:

_____
EARL, P. J.

_____
KRAUSE, J.

12